We will begin by hearing argument in Prakash versus Escobar. Mr. Goldberg is up for the appellant. Judge Kobrenesen, may it please the court, I've reserved three minutes. Yes, your honor. Rule 8A2 applies to this pleading requiring only a short plain statement of the case showing that plaintiff's claim is plausible. I start with respect to the $100 million in claims. And I ask Judge LaValle to recall colloquy in the Setzer versus Omega case. This does not relate to the amount of these costs, Judge LaValle, as you'll recall from Omega, but whether the description of these costs disguise their true nature. You'll recall Judge LaValle that in colloquy with defense counsel, you said with respect to the loan at issue in Omega, hey, this is a loan, but it really was a rental obligation that you disguised as a loan, eliminating your need to disclose it, even though the financial statements were materially accurate and the plaintiffs plead no gasp violation. In that context, in describing these operating costs, the prospectus does not describe reimbursements or indemnities at all. And it doesn't mention operating errors from systems or people at all. I refer you to A67 paragraph 127. The real description of these operating costs, which the prospectus omits, and that the Brazilian regulatory filing contains is that these were operating errors comprising one, failures of A systems or B people, that two led to errors in execution, that three resulted in indemnity. The prospectus does not mention that. Now, the context is key here. In listing the amounts of other costs, the prospectus indicates that they are- We're all, Counselor, were all the amounts listed? Were any omitted? In which document, Your Honor? So Judge Chin- The prospectus, the 100 million, when you added it all up, I guess you would have preferred a different description, but one question is, were any losses omitted from the prospectus? To our knowledge, no, Judge Chin. The prospectus amount and the amount that CCTVM, XP subsidiary, disclosed in Brazilian regulatory filings are the same. But Judge Chin, the context here, again, is critical because in failing to include what these costs consisted of in the list of costs in the prospectus, the prospectus ignores its very own risk disclosure. And Judge Chin, I refer you to A68 paragraph 129. And I'm quoting now, including human errors could occur. These delays or errors could cause substantial losses for customers and could subject us to claims from these customers for losses or other regulatory penalties or sanctions. So Judge Chin, in the context of a risk disclosure about these very costs, they omit- I beg your pardon. The prospectus omits any reference to the true description of these costs. And as Judge LaValle had mentioned in the Omega case, that disguises the costs. Even as Judge Chin, the costs are the same in both regulatory filing and in prospectus. So it doesn't change- Mr. Goldberg, help me with your reference to the appendix. You said it was paragraph 129. So Judge Cabreras, the risk disclosure is paragraph 129 in full. My reading was an excerpt. Where is your reading exactly? I want to just follow your- Sure, sure. I'm happy to do that again. And so if you turn to A68, you'll see, Judge, that there is a block quotation indented. And if you go sort of halfway down, it begins, in addition, systems errors, including as a result of human error, could occur. These delays or errors could cause substantial losses for customers and could subject us to claims from these customers for losses or other regulatory penalties or sanctions. So Judge Cabreras, in the context of that risk disclosure, there were actual costs that were material consisting of $100 million. Now, what the defendants do is, in the prospectus, there is no discussion of operating errors. There is no discussion of the nature of these costs. Instead, the only descriptor at A65 paragraph 123, Judge Cabreras, is, in listing the amounts of other costs, the prospectus indicates- Sorry, hold on a second. Sure, sure. What was that reference again? I beg your pardon. A65 paragraph 123. And what you'll see there in that footnote, which is the only descriptor with respect to this $100 million of costs, even as it relates only to a portion of those costs, it says, Judge Cabreras, mainly related to reimbursements to customers due to losses they had from their relationship, and I emphasize this, with a former IFA associated with the subsidiary. So a reasonable reading of, a plausible reading of this, Judge, is that one now former IFA is responsible for these costs, not several IFAs, and not human errors and system errors, and not execution errors. So the person, the only- Why would that have mattered? Well, it- That it was several as opposed to one. Well, Judge Chin, it would matter if it was, if it was greater than one, because IFAs, as you know, are important to the whole, but if you look at these costs, the IFA, even if it was one, is but one portion of this $100 million relating to these operating errors. It does say, it does say mainly related in the footnote. Absolutely, Judge, and I think we could take that as saying that anything above and beyond this is immaterial, because there's- May I continue, Your Honor? Yes, yes, please. Yes, okay. So because, effectively, they're not describing the entirety of this $100 million in the context of the risk disclosure, in the context of what these costs could be, Judge Chin, this is a disguise. Investors cannot understand these costs first, and second, assess how they impact these costs second. Now, I refer you, if I may, with respect to plausibility, back to Twombly, where the court will remember the Supreme Court was dealing with anti-competitive conduct, in particular, pricing that mimicked one another, and the district judge found correctly and reasonably that this could indicate illegal conduct, but the district judge found it was more likely that it wasn't, or that it was legal, I beg your pardon, and that's why the district court dismissed and the Supreme Court affirmed. But we've never heard from the district judge or from the defendants, in this case, Judge Chin, where that contrary inference or contrary fact is. What is the contrary thing here? They don't claim that the $100 million in costs are immaterial. They say that we haven't pleaded with particularity what they are, but we don't have to plead with exhaustive detail, as Your Honor knows, but we have pleaded because they admit that these are operating execution costs, including system errors and human errors that caused them to reimburse. But that appears nowhere in the perspective, except Judge Chin, as a risk disclosure. So if we're doing a Twombly plausibility analysis here, we have yet to see what the other side is, because no one's ever described it. We've described how, in Judge LaValle's words from the Omega case, this is a disguise of $100 million of costs, but they haven't described why that's legal. Okay, Mr. Goldberg, you've had a couple of extra minutes, but that's fine. You've reserved three, and we'll hear from Antonio Perez Marquez. Good afternoon, Your Honors, and may it please the court, Antonio Perez Marquez from Davis Polk and Wardwell for the appellees. Appellant's claim with respect to the operating expenses is based entirely on an observed difference between the issuer's financial statements and those of a different entity prepared under different accounting standards. So when my friend, Mr. Goldberg, refers to what is the contrary thing, there are at least two, a different entity and different accounting standards. Now, appellants have not cited a single case with this fact pattern, where a claim based only on an observed difference between two sets of financials has survived dismissal, even under Rule 8. There are four cases that have been cited on this appellate record involving that fact pattern. All four of them are dismissals, including two of them affirmed by this court. Now, it's undisputed, as Judge Chin noted, that every penny of these costs was accurately accounted for in the issuer's financial statements, and there was no impact on the issuer's bottom line. There are also no facts alleged as to the alleged true nature of these expenses that was allegedly misrepresented. No facts that would suggest the expenses were anything other than ordinary course. No facts that would suggest the market ever ascribed any significance to this portion of the subsidiary's operating expenses, which, by the way, amount to less than 2% of the issuer's total operating costs and expenses. One of my friends- How do you respond to the argument that with respect to the operating expenses, that it was misleading because it alludes to a former IFA associate and should have said more there? Judge Chin, that is- That somehow disguised the true nature of the losses. That is an absolute apples and oranges comparison because they are taking the description that was attached to one line item in the financial statements of one entity and comparing it to the description of a different line item in the financial statements of a different entity. That is not a description that can be mapped one-to-one with the quote-unquote operating errors line item that my friend Mr. Goldberg refers to as revealing the alleged truth. The only factual content alleged here by plaintiffs, to use the language of Iqbal, the only factual content as to the alleged true nature of these expenses is how they were reported by a different entity under different accounting standards. And I would point the court to this court, the decision of a panel of this court in the Harris case where the court affirmed the dismissal of section 11 claims under rule eight, holding that an observed discrepancy between two sets of financials could not sustain the claims asserted without more specific factual allegations, particularly when the issuer had disclosed that such a discrepancy was likely. That is precisely the fact pattern we have here, an observed difference between two sets of financials without any more factual allegations as to what the costs were, and a disclosure by the issuer, which you can see at page 457 of the appendix, that adjustments to subsidiary financials had been made to conform to the issuer's accounting standards. Now, Harris notably, like this case, was a case based almost entirely on a short seller report. The Winkler group here was not the first short seller to go looking for these types of differences, and these are not the first plaintiffs to try to state a securities claim on that basis, but they've identified no case where a mere difference between the financial statements of two different entities under different accounting standards was deemed sufficient to survive dismissal. And to rule otherwise, we respectfully submit, would open the floodgates to these types of claims, would invite foreign standards to dictate U.S. reporting, incentivize issuers to conform their U.S. financials to overseas standards, and override management's well-recognized discretion to choose among permissible accounting treatments. China Valves is another highly analogous case that is entirely ignored in appellant's briefing. They don't mention that case. It also arose from a perceived discrepancy or difference between two sets of financials, and Judge Kaplan in that case found that that was an insufficient basis because there was no plausible basis to believe that the difference was attributable to anything other than a difference in accounting standards. Here, the reason there is no plausible basis is that there are no facts alleged that would support appellant's position that the expenses should have been grouped as they prefer, no facts alleged that support the idea that these errors or costs were systemic, pervasive, or otherwise presented a material risk. The number that they've cited, $100 million, that's not even correct. It's 100 million Brazilian reais over the course of three years, peaking at about 10 million U.S. dollars, an amount that is less than 2%, excuse me, approximately 1% of the issuer's revenue. That's what we're talking about here. And I would note that appellants were invited by the district court to add further detail. You can see that at pages 121 of the appendix, and again at 122 and 126. They were put on notice that they lacked sufficient factual basis to render their claims not just possible, but plausible as is required under Rule 8. And they declined that invitation. They chose not to add that detail. Let's go, Mr. Perez, let's go to page A121. Why don't you walk us through this? Yes, Your Honor. Let me just flip to that page. This was at the pre-motion conference that preceded the district court motion to dismiss. And we were having a colloquy on this very issue, whether they had alleged sufficient facts in light of the difference in accounting standards to support a plausible inference that the difference was due to anything other than the difference in accounting standards. And Judge Kogan asked plaintiffs at line 22 and 23, do you have any more details that you would like to include by way of an amended complaint? Plaintiffs took that question away and responded by letter shortly thereafter, indicating that no, they were not going to amend. On page 122, again, the court asked them whether they might have a fuller complaint that they would want to present. They declined that invitation. And at page 126, tracking the rule eight standard as articulated by Iqbal, Judge Kogan said, is your claim just possible? It is certainly possible, but is it plausible? I am not sure. That is why I have asked you, and you have agreed to think about whether there is any more to it that you want to contribute. They have no such factual allegations. The sole factual content is the description in the Brazilian subsidiary's financials. And I would encourage the court to look at that description, which is on page 636 of the appendix. And what you can see there is that the line item for operating errors, the one to which they attach this significance, is described as arising, as defined as meaning indemnities paid to customers. Now, I think we showed in our briefing that that term indemnities is synonymous per Black's Law Dictionary with the term reimbursements that was used by the issuer. And it's only a portion of those indemnities that even at the subsidiary level are indicated to have arisen from any form of system error or human error. And let me note the case Setzer, on which they rely prominently, bears no factual resemblance to this case. That case involved allegations that an issuer had misrepresented the financial distress of its most important customer, a topic which as this court noted was of keen interest to analysts, a topic on which analysts had specifically sought more information and which the issuer had discussed repeatedly without disclosing that the customer was being kept afloat by a secret loan. Not a case, none of Appellant's cases involve a case like this one of a discrepancy between two sets of financials. When you look at the cases on which they rely, this case has none of those characteristics, no restatement, no whistleblower, no factual allegation that would suggest the market or analysts ever ascribed any importance to this portion of the subsidiary's operating costs, no subsequent revelation of any concealed facts, only a difference with the published financial statements of a different entity under different financial accounting standards. That is not enough to state a claim. Thank you. Now, Mr. Schwartz wishes to be heard, is that right? No, Your Honor, Mr. Perez is arguing for all defendants. I see, you're listed here, that's why I asked. Thank you very much. All right, Mr. Perez, go ahead, wrap it up. I will wrap it up, Your Honor, just by noting that the description of these expenses in the subsidiary's financials is simply too slimmer read to support a plausible inference that there was anything material about this company that would have altered the total mix of information for a reasonable investor. Thank you very much. Mr. Goldberg is reserved three minutes. Your Honor, thank you very much. Let me, if I may, refer you to A543, A543. This is defendant XP's response to the Winkler report and it reads, again, A543. In fact, this is just a question of reallocating those expenses to relevant line items in the income statement. They're not denying the actual description of the expenses that the Winkler report noted on page A529, A529, that these are operating errors, the result of indemnities paid to customers mostly derived from errors in execution of orders for failure of the systems or of people. If I may, Your Honors, address the Harris China Valve line of cases. Those cases involved certainly different accounting treatments that led to different, materially different amounts. So for example, the reserves in Harris, the company disclosed things to regulators based on statutory accounting, and that is different than GAF accounting. And what this court and Judge Caproni found were that that alone does not indicate that the SEC filing as opposed to the regulatory filing was false, the plaintiffs needed more. Here, we're not saying that the amount is different. This is not about the calculation of the amount. Rather, it's about how the defendants described them. And if you don't describe these costs, again, in the context of the risk disclosure, you are disguising the nature of those costs, which is why Harris and its ancestors and progeny are inapplicable. And- When the amount be relevant to materiality, and I guess I was interested in, you know, your response to counsel's suggestion that given the difference in exchange rate and the fact that it was spread out over a number of years, we're talking about much smaller amounts of money in US dollars. Judge Chin, all of the defendants' statements in Brazil are stated in Real. Your Honor, with apologies, I remember no such argument either below or in this court from the defendants that these costs were immaterial. What we are left with, Judge Chin, is on page eight, five to nine of the record in which the Winkler Report says these are, they use the word significant. These are significant in 2016. These were 8.1% of net income. In 2017, they were 6.6%. And in 2018, operating errors are equal to 7.8%. So I think that we should not fall trap to materiality at this point because it's the first time defendants raise it. But, and Your Honor, also the stock price fell directly in, may I continue, Your Honor? Please. Directly in response to the Winkler Report, the stock price falls 14%. As Your Honors know from SAB 99, while absolutely not determinative, the fall at the end when correction occurs is an indicator of materiality as it is in this case. But the real point is that my friend, Mr. Paris Marquez, has told you that this is a difference of accounting. It's absolutely not. We effectively don't care about how it was calculated and we don't allege that it was calculated incorrectly. Rather, what we allege is that they disguised these costs by failing to describe them. And in context, that is materially misleading. Right, Mr. Goldberg, I have a simple, almost clerical question. Assuming for the argument that we agree with your position, what is the remedy in your view? Should we remand or should we be deciding the issue de novo? You seem to suggest that on page 10 of your reply that we should decide the issue de novo, is that right? Well, Your Honor, my understanding is this court is engaged in a de novo review. And if it finds that the district court improperly dismissed one or both of the claims still at issue, it should vacate and remand with instructions to allow the case to proceed. So you're not asking us to determine this with finality? The pleading issue we are, Your Honor, if the court reverses or vacates and remands, that would be with an instruction to the district court to simply allow us to proceed to discovery. All right, thanks. Since that question was not put to Mr. Perez Marquez, maybe I can ask him if he would just address that issue about what the court's decree would be in the event we agreed with plaintiff's general argument. Your Honor- Why don't you take one minute? Certainly, we believe that the court should be affirming the district court's dismissal. And this is a de novo review on which the court may affirm on any basis presented by the record, including materiality. And certainly I think appellants have acknowledged that we've been arguing materiality strenuously. I believe they characterized it as our only argument in their appellate briefing. And their characterization of Harris as well, I think is entirely misleading that in that case, the allegation in that case was that the effect of the alleged misclassification of the expenses was to mislead as to the issuer's financial condition by skewing loss ratios, such that it presented a misimpression of above average performance. That is on all fours with the fact pattern we have here. And the notion that the company in any respect agreed with the Winkler reports allegations is absolutely false. It's practically the first sentence of the responsive 6K that Winkler was overlooking the difference in accounting standards and relying on improper comparisons. So these arguments that are relied on suggesting that any results different from the result reached by the district court should be obtained here, we fundamentally disagree with. Thanks very much, Mr. Bates. So we'll reserve decision and move to the second case to be heard for argument today. Thank you both very much for excellent arguments. Thank you, Your Honor.